1  Peter Goldstein, SBN 6992
2  PETER GOLDSTEIN LAW CORP
   peter@petergoldsteinlaw.com
3  10161 Park Run Drive, Suite 150
   Las Vegas, Nevada 89145
4  Telephone: (702) 474-6400
5  Facsimile: (888) 400-8799

6  Attorney for Plaintiffs
7  *MARIAM BLUE, individually, and as*
   *Special Administrator of the Estate of*
8  *STEPHEN BURRELL; LISA L. CARROLL on*
   *behalf of her wards, SMB and SFB,*
9  *individually*
10

11          **UNITED STATES DISTRICT COURT**
12          **DISTRICT OF NEVADA (LAS VEGAS)**
13

| 14 | MARIAM BLUE, individually, and as Special Administrator of the Estate of STEPHEN BURRELL; LISA L. CARROLL on and behalf of her wards, SMB and SFB, individually, | Case No. 2:21-cv-00372-RFB-DJA |
|---|---|---|

15

16          **FIRST AMENDED COMPLAINT FOR DAMAGES**

17                     Plaintiffs

18         vs.                          (1) DELIBERATE INDIFFERENCE TO
                                            SERIOUS MEDICAL NEEDS IN
19                                          VIOLATION OF THE
    CITY OF LAS VEGAS; WELLPATH,            FOURTEENTH AMENDMENT (42
20  LLC F/K/A CORRECT CARE                  U.S.C. § 1983)
    SOLUTIONS, LLC; LIEUTENANT
21  DANIELLE DAVIS; LIEUTENANT          (2) DEPRIVATION OF FAMILIAL
    MATTHEW TRIPLETT; OFFICER              ASSOCIATION IN VIOLATION OF
22  RICHARD DORADO; OFFICER               THE FOURTEENTH AMENDMENT
    D'ANGELO CHAPARRO-WILSON;             (42 U.S.C. § 1983)
23  OFFICER MAURICE WASHINGTON;
24  SERGEANT MARCOS PARKER;            (3) OVER-DETENTION IN
    SERGEANT CHARLES SMITH;               VIOLATION OF THE
25  SERGEANT JOHN WEDIG;                  FOURTEENTH AMENDEMNT (42
    SERGEANT J. SCHROYER;                 U.S.C. § 1983)
26
27                                      (4) *MONELL* LIABILITY – FAILURE
28                                          TO TRAIN (42 U.S.C. § 1983)

SERGEANT L. HOLMES; OFFICER A. ELIASON; OFFICER TRAVIS RAZ; OFFICER DAMON MILLETT; SERGEANT BLEDSOE; SHAWN MAPLETON; MICHAEL POPOV; VIRGILIO PADILLA; FRANCIS BODDIE-SMALL; EBONYMICHELLE D. GARNER; DEE MORGAN, aka Vicky Morgan; REGINA ELIZONDO; DOCTOR BENET; DOCTOR STILL; JAMES TENNEY; NICOLE ASHLEY THOMSON; MICHELLE FERNANDEZ; LOVELLA A. PONGAN; ASHLEY NICOLE PHILLIPS; DOES 1-35, inclusive,

Defendants.

(5)  *MONELL* LIABILITY – POLICY & CUSTOM (42 U.S.C. § 1983)

(6)  DISABILITY DISCRIMINATION IN VIOLATION OF § 504 OF THE REHABILITATION ACT OF 1973 AND TITLE II OF THE AMERICANS WITH DISABILITIES ACT (29 U.S.C. § 794(a); 42 U.S.C. § 12131 et seq.)

(7)  WRONGFUL DEATH (NEVADA STATE LAW)

(8)  WRONGFUL DEATH (NEVADA STATE LAW)

(9)  NEGLECT OF A VULNERABLE PERSON (NEVADA STATE LAW)

(10) MEDICAL MALPRACTICE (NEVADA STATE LAW)

Exhibit "A" Redacted Death Certificate

Exhibit "B" Order Appointing Special Administrator

Exhibit "C" Affidavit in Support of Medical Malpractice Claim

**JURY TRIAL DEMANDED**

Plaintiff MARIAM BLUE, individually, and as the Special Administrator of the estate of STEPHEN BURRELL, along with minor Plaintiffs SMB and SFB, by their legal guardian LISA L. CARROLL, allege upon information, belief, and personal knowledge:

**INTRODUCTION**

1.     On January 12, 2019, decedent STEPHEN BURRELL ("STEPHEN"), a twenty-four-year-old African-American man suffering from schizophrenia, bipolar

disorder, major depressive disorder, polysubstance dependence disorder, psychosis, and other mental health and medical impairments and diagnoses, was arrested by officers from the North Las Vegas Police Department on a charge of trespass not amounting to burglary for sleeping in a local taco shop.

2.     According to the arrest report, the officers decided to take STEPHEN into custody, as opposed to issuing a citation, because STEPHEN had previously been arrested or cited for the same offense fifteen times in two years.

3.     Upon being arrested, STEPHEN was transported to the Las Vegas Detention Center ("City Jail"), where he was booked, screened, and placed in an administrative segregation—or isolation—cell.

4.     When STEPHEN entered the City Jail on January 12, 2019, he weighed 174 pounds.

5.     On March 8, 2019, still in isolation, STEPHEN was found unresponsive in his cell and later pronounced dead at Sunrise Hospital.

6.     On March 9, 2019, the Clark County Coroner conducted an autopsy and determined that STEPHEN had died of starvation.

7.     At the time of his autopsy, STEPHEN weighed 128 pounds, having lost 46 pounds in 56 days.

8.     On at least two prior occasions, while STEPHEN was held at the City Jail, the Court ordered him released to the custody of Southern Nevada Adult Mental Health for treatment and stabilization at the Rawson Neal Psychiatric hospital, specifically because he was unable to eat or engage in life-sustaining self-care.

9.     Despite being well-aware of STEPHEN's impairments and diagnoses, Defendants, and each of them, failed to properly house, treat, monitor, and otherwise protect STEPHEN during his confinement.

10.     Instead, the Individual Defendants stood by and watched as STEPHEN slowly and painfully starved to death.

11.    STEPHEN's death and the Individual Defendants' conduct was the direct result of the policies, procedures, and customs of the CITY OF LAS VEGAS ("CITY") and WELLPATH, LLC F/K/A CORRECT CARE SOLUTIONS, LLC ("WELLPATH"), the company which provides medical and mental health care to detainees held at the City Jail.

12.    Plaintiffs now bring this action for compensatory and punitive damages for Defendants' violations of the constitutional and statutory rights of STEPHEN, his mother, MARIAM BLUE, and his minor children, SMB an SFB.

**PARTIES**

13.    At all relevant times, STEPHEN BURRELL ("STEPHEN") was an individual residing in Clark County, Nevada, who suffered from schizophrenia, bipolar disorder, major-depressive disorder, polysubstance-dependence disorder, psychosis, and other mental health and medical impairments and diagnoses, qualifying him for the protections of the Americans with Disabilities Act ("ADA").

14.    STEPHEN is survived by his mother, Plaintiff MARIAM BLUE ("BLUE"), a resident of Clark County, Nevada. She brings suit on behalf of herself and as the Special Administrator of the Estate of STEPHEN BURRELL.

15.    STEPHEN is survived by his minor child, Plaintiff SMB, a resident of Riverside County, California. SMB's interests are represented in this action by his legal guardian, LISA L. CARROLL.

16.    STEPHEN is survived by his minor child, Plaintiff SFB, a resident of Riverside County, California. SFB's interests are represented in this action by his legal guardian, LISA L. CARROLL.

17.    Defendant CITY OF LAS VEGAS ("CITY") is a municipal corporation and subdivision of Clark County, duly organized and existing under the laws of the State of Nevada.

18.     The CITY is responsible for managing, maintaining, and controlling the Las Vegas Detention Center, also known as the "City Jail," as well as its employees and agents.

19.     The CITY, by and through its officials and supervisors at its central offices, jails, facilities, and specialized units, promulgates, implements, and executes policies relating to the conditions of confinement at the City Jail, including those related to medical and mental health care.

20.     The CITY's officials and supervisors are aware of and tolerate practices by subordinate employees and agents at the CITY JAIL, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the CITY's agencies, constitute unwritten CITY policies or customs.

21.     The CITY is also responsible for the training, supervision, discipline, and conduct of all CITY employees and agents, including all of the Individual Defendants in this action.

22.     The CITY is therefore liable to Plaintiffs under a theory of *respondeat superior* for all those claims where such vicarious liability is available.

23.     Defendant DANIELLE DAVIS ("DAVIS") was at all relevant times a Corrections Lieutenant with the City of Las Vegas Department of Public Safety and a supervisor at the City Jail. DAVIS was an employee and agent of the CITY, with all the duties and authority attendant to her position as a manager, supervisor, and policymaker. She is sued in her individual capacity for acts committed under color of state law and within the scope of her duties and authority as a supervisor for the CITY.

24.     DAVIS was a supervisor with responsibility for classification, LEST, medical, PREA, and OHC. She completed the Department of Justice Death Report and had personally been aware of STEPHEN's impairments and diagnoses since at least 2016.

25.     Defendant MATTHEW TRIPLETT ("TRIPLETT") was at all relevant times a City of Las Vegas Department of Public Safety Lieutenant and supervisor. TRIPLETT

was an employee and agent of the CITY, with all the duties and authority attendant to his position as a manager, supervisor, and policymaker. He is sued in his individual capacity for acts committed under color of state law and within the scope of his duties and authority as a supervisor for the CITY.

26.     TRIPLETT was a supervisor with responsibility for Department of Public Safety internal affairs and the training of Corrections Officers.

27.     Defendant DOES 16–20 were at all relevant times supervisors at the City Jail and Department of Public Safety. DOES 16–20 were employees and agents of the CITY, with all the duties and authorities attendant to their positions as managers, supervisors, and policymakers. They are sued in their individual capacities for acts committed under color of state law and within the scope of their duties and authorities as supervisors for the CITY.

28.     Defendants DAVIS, TRIPLETT, and DOES 16–20 are referred to collectively as the "SUPERVISORY DEFENDANTS."

29.     Defendant OFFICER RICHARD DORADO ("DORADO") was at all relevant times a Corrections Officer at the City Jail. DORADO was an employee and agent of the CITY. He is sued in his individual capacity for acts committed under color of state law and within the scope of his duties and authority as an officer for the CITY.

30.     Defendant OFFICER D'ANGELO CHAPARRO-WILSON ("CHAPARRO-WILSON") was at all relevant times a Corrections Officer at the City Jail. CHAPARRO-WILSON was an employee and agent of the CITY. He is sued in his individual capacity for acts committed under color of state law and within the scope of his duties and authority as an officer for the CITY.

31.     Defendant OFFICER MAURICE WASHINGTON ("WASHINGTON") was at all relevant times a Corrections Officer at the City Jail. WASHINGTON was an employee and agent of the CITY. He is sued in his individual capacity for acts committed under color of state law and within the scope of his duties and authority as an officer for the CITY.

32.    Defendant SERGEANT MARCOS PARKER ("PARKER") was at all relevant times a Corrections Officer at the City Jail. PARKER was an employee and agent of the CITY. He is sued in his individual capacity for acts committed under color of state law and within the scope of his duties and authority as an officer for the CITY.

33.    Defendant SERGEANT CHARLES SMITH ("SMITH") was at all relevant times a Corrections Officer at the City Jail. SMITH was an employee and agent of the CITY. He is sued in his individual capacity for acts committed under color of state law and within the scope of his duties and authority as an officer for the CITY.

34.    Defendant SERGEANT JOHN WEDIG ("WEDIG") was at all relevant times a Corrections Officer at the City Jail. WEDIG was an employee and agent of the CITY. He is sued in his individual capacity for acts committed under color of state law and within the scope of his duties and authority as an officer for the CITY.

35.    Defendant SERGEANT J. SCHROYER (#797) ("SCHROYER") was at all relevant times a Corrections Officer at the City Jail. SCHROYER was an employee and agent of the CITY. They are sued in their individual capacity for acts committed under color of state law and within the scope of their duties and authority as an officer for the CITY.

36.    Defendant SERGEANT L. HOLMES (#764) ("HOLMES") was at all relevant times a Corrections Officer at the City Jail. HOLMES was an employee and agent of the CITY. They are sued in their individual capacity for acts committed under color of state law and within the scope of their duties and authority as an officer for the CITY.

37.    Defendant OFFICER A. ELIASON (#1082) ("ELIASON") was at all relevant times a Corrections Officer at the City Jail. ELIASON was an employee and agent of the CITY. They are sued in their individual capacity for acts committed under color of state law and within the scope of their duties and authority as an officer for the CITY.

38.    Defendant OFFICER TRAVIS RAZ ("RAZ") was at all relevant times a Corrections Officer at the City Jail. RAZ was an employee and agent of the CITY. He is

sued in his individual capacity for acts committed under color of state law and within the scope of his duties and authority as an officer for the CITY.

39.    Defendant OFFICER DAMON MILLETT ("MILLETT") was at all relevant times a Corrections Officer at the City Jail. MILLETT was an employee and agent of the CITY. He is sued in his individual capacity for acts committed under color of state law and within the scope of his duties and authority as an officer for the CITY.

40.    Defendant SERGEANT BLEDSOE ("BLEDSOE") was at all relevant times a Corrections Officer at the City Jail. BLEDSOE was an employee and agent of the CITY. They are sued in their individual capacity for acts committed under color of state law and within the scope of their duties and authority as an officer for the CITY.

41.    Defendant DOES 1–15 were at all relevant times Corrections Officers at the City Jail. DOES 1–15 were employees and agents of the CITY. They are sued in their individual capacities for acts committed under color of state law and within the scope of their duties and authorities as officers for the CITY.

42.    Defendants    DORADO,    CHAPARRO-WILSON,    WASHINGTON, PARKER, SMITH, WEDIG, SCHROYER, HOLMES, ELIASON, RAZ, MILLETT, BLEDSOE, and DOES 1–15 are referred to collectively as the "OFFICER DEFENDANTS."

43.    Defendant WELLPATH, LLC F/K/A CORRECT CARE SOLUTIONS, LLC ("WELLPATH") is a for-profit private corporation that at all relevant times contracted with the CITY to provide medical and mental health care to the individuals housed at the City Jail.

44.    WELLPATH is an agent and adjunct of the CITY and is responsible for the provision of such services, as well as managing and controlling its employees and agents at the City Jail.

45.    WELLPATH, by and through its officials and supervisors, promulgates, implements, and executes policies relating to the conditions of confinement at the City Jail, including those related to medical and mental health care.

46.    WELLPATH's officials and supervisors are aware of and tolerate practices by subordinate employees and agents at the City Jail, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in WELLPATH's culture, constitute unwritten policies or customs.

47.    WELLPATH is also responsible for the training, supervision, discipline, and conduct of all WELLPATH employees and agents, including the Medical Defendants in this action.

48.    Defendant SHAWN MAPLETON ("MAPLETON") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail. He is sued in his individual capacity for acts committed under color of state law and within the scope of his duties and authority as a medical provider for WELLPATH and the CITY.

49.    Defendant MICHAEL POPOV ("POPOV") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail. He is sued in his individual capacity for acts committed under color of state law and within the scope of his duties and authority as a medical provider for WELLPATH and the CITY.

50.    Defendant VIRGILIO PADILLA ("PADILLA") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail.  They are sued in their individual capacity for acts committed under color of state law and within the scope of their duties and authority as a medical provider for WELLPATH and the CITY.

51.    Defendant FRANCIS BODDIE-SMALL ("BODDIE-SMALL") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail.  They are sued in their individual capacity for acts committed under color of state law and within the scope of their duties and authority as a medical provider for WELLPATH and the CITY.

52.    Defendant EBONYMICHELLE D. GARNER ("GARNER") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail.  She is sued in her individual capacity for acts committed under color of state law

and within the scope of her duties and authority as a medical provider for WELLPATH and the CITY.

53.    Defendant DEE MORGAN, aka Vicky Morgan ("MORGAN") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail.  She is sued in her individual capacity for acts committed under color of state law and within the scope of her duties and authority as a medical provider for WELLPATH and the CITY.

54.    Defendant REGINA ELIZONDO ("ELIZONDO") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail.  She is sued in her individual capacity for acts committed under color of state law and within the scope of her duties and authority as a medical provider for WELLPATH and the CITY.

55.    Defendant DOCTOR BENNET ("BENNET") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail.  They are sued in their individual capacity for acts committed under color of state law and within the scope of their duties and authority as a medical provider for WELLPATH and the CITY.

56.    Defendant DOCTOR STILL ("STILL") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail.  They are sued in their individual capacity for acts committed under color of state law and within the scope of their duties and authority as a medical provider for WELLPATH and the CITY.

57.    On information and belief, STILL was contacted by POPOV regarding STEPHEN's mental or physical health on February 14, 2019.

58.    Defendant JAMES TENNEY ("TENNEY") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail.  He is sued in his individual capacity for acts committed under color of state law and within the scope of his duties and authority as a medical provider for WELLPATH and the CITY.

59.    Defendant NICOLE ASHLEY THOMSON ("THOMSON") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail.  She is sued in her individual capacity for acts committed under color of state law and within the scope of her duties and authority as a medical provider for WELLPATH and the CITY.

60.    Defendant MICHELLE FERNANDEZ ("FERNANDEZ") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail.  She is sued in her individual capacity for acts committed under color of state law and within the scope of her duties and authority as a medical provider for WELLPATH and the CITY.

61.    Defendant LOVELLA A. PONGAN ("PONGAN") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail.  She is sued in her individual capacity for acts committed under color of state law and within the scope of her duties and authority as a medical provider for WELLPATH and the CITY.

62.    Defendant ASHLEY NICOLE PHILLIPS ("PHILLIPS") was at all relevant times an employee and agent of WELLPATH and a medical provider at the City Jail.  She is sued in her individual capacity for acts committed under color of state law and within the scope of her duties and authority as a medical provider for WELLPATH and the CITY.

63.    Defendant DOES 21–35 were at all relevant times employees and agents of WELLPATH and medical providers at the City Jail. They are sued in their individual capacities for acts committed under color of state law and within the scope of their duties and authorities as medical providers for WELLPATH and the CITY.

64.    Defendants MAPLETON, POPOV, PADILLA, BODDIE-SMALL, GARNER, MORGAN, ELIZONDO, BENNET, STILL, TENNEY, THOMSON, FERNANDEZ, PONGAN, PHILLIPS, and DOES 21–35 are referred to collectively as the "MEDICAL DEFENDANTS."

65.    The true names of Does 1–35, inclusive, are currently unknown to Plaintiffs. Plaintiffs allege that Does 1–35 may be liable for the acts, omissions, and damages alleged

herein, and will seek leave to amend this Complaint when and if their true names and capacities are ascertained.

66.    The "SUPERVISORY DEFENDANTS," "OFFICER DEFENDANTS" and "MEDICAL DEFENDANTS" are referred to collectively as the "INDIVIDUAL DEFENDANTS."

## JURISDICTION AND VENUE

67.    This civil action is brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986, 1988, the Fourteenth Amendment to the United States Constitution, § 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act ("ADA"), 29 U.S.C. § 794(a); 42 U.S.C. § 12131.

68.    Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343, 1367, and other statutory provisions.

69.    Venue is proper in the United States District Court for the District of Nevada pursuant to 28 U.S.C. § 1391(b) because all events, incidents, and occurrences giving rise to Plaintiffs' claims took place in Clark County, Nevada.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

**Stephen's detention, starvation, and death.**

70.    On January 12, 2019, officers from the North Las Vegas Police Department arrested STEPHEN on charges of trespass not amounting to burglary for sleeping in a local taco shop.

71.    Upon his arrest, the officers transported STEPHEN to the Las Vegas Detention Center ("City Jail"), where he was held as a pre-trial detainee from January 12, 2019 until his death on March 8, 2019.

72.    When, on January 12, 2019, STEPHEN was booked and screened at the City Jail, he weighed 174 pounds.

73.    On February 20, 2019, STEPHEN weighed 142 pounds.

74.    On February 27, 2019, STEPHEN weighed 136.8 pounds.

75.    When, on March 9, 2019, STEPHEN's body was examined by the Clark County Coroner, he weighed 128 pounds. The Coroner determined that the primary cause of STEPHEN's death was inanition, or death by starvation.

76.    Prior to and during his detention at the City Jail, STEPHEN suffered from schizophrenia, bipolar disorder, major-depressive disorder, polysubstance-dependence disorder, psychosis, and other mental health and medical impairments and diagnoses.

77.    On at least two prior occasions, while STEPHEN was held at the City Jail, the Court ordered STEPHEN released from jail and into the custody of Southern Nevada Adult Mental Health for treatment and stabilization at the Rawson Neal Psychiatric hospital, specifically because he was unable to eat or engage in life-sustaining self-care.

78.    Thus, each and every INDIVIDUAL DEFENDANT either knew or should have known of STEPHEN's various diagnoses and their deleterious effect on his ability to engage in self-care.

79.    On or about January 12, 2019, the OFFICER DEFENDANTS and MEDICAL DEFENDANTS, including Defendant SMITH, a Corrections Sergeant, and Defendant PONGAN, a WELLPATH supervisor, placed STEPHEN in isolation rather than a medical or psychiatric unit able to address his medical and mental health needs.

80.    On information and belief, STEPHEN was never placed in a medical or psychiatric unit, but remained in isolation until his death.

81.    A couple days before February 2, 2019, unknown Corrections Officers became aware that STEPHEN had stopped engaging in self-care and stopped eating his food.

82.    These Corrections Officers notified the MEDICAL DEFENDANTS, including Defendant FERNANDEZ.

83.    On or about February 2, 2019, Defendant FERNANDEZ placed STEPHEN on a food log.

1    84.    On February 3, 2019, Defendant POPOV discussed STEPHEN's failure to
2    engage in self-care with the attending doctor, Defendant BENNET.

3    85.    On February 9, 2019, Defendants DORADO and BLEDSOE notified
4    Defendants BODDIE-SMALL, PADILLA, FERNANDEZ and THOMSON that
5    STEPHEN had not eaten since February 2, 2019.

6    86.    Defendant THOMSON responded by advising STEPHEN to inform
7    unspecified Corrections Officers when he was ready to "comply" with nursing staff.

8    87.    On February 13, 2019, Defendant MORGAN reviewed STEPHEN's food
9    log and noted that he had not eaten since February 9, 2019.

10    88.    On February 14, 2019, Defendant POPOV evaluated STEPHEN and
11    discussed his failure to engage in self-care with Defendant STILL.

12    89.    Defendant POPOV failed to take or record STEPHEN's weight.

13    90.    Defendant POPOV failed to intervene in any medically meaningful way.

14    91.    Instead, Defendant POPOV encouraged STEPHEN to drink milk, Gatorade,
15    and water and scheduled a follow up for three weeks later.

16    92.    Defendant POPOV chose not to provide any medical care even though
17    STEPHEN had not eaten for at least two weeks and was clearly suffering from a severe
18    mental illness.

19    93.    On February 15, 2019, STEPHEN told Defendant PADILLA that he wanted
20    to eat but had no appetite.

21    94.    On February 20, 2019, six days after Defendant POPOV evaluated him,
22    STEPHEN weighed 142 pounds, 32 pounds less than he weighed 39 days earlier.

23    95.    On February 20, 2019, Defendant TENNEY evaluated STEPHEN.

24    96.    Defendant TENNEY noted: (1) STEPHEN's weight was in decline; (2)
25    STEPHEN was on a food log for insufficient self-care; (3) STEPHEN's weight loss was
26    not volitional or oppositional, but a "by-product" of psychological or developmental
27    "challenges"; (4) STEPHEN was noncommunicative, had no appreciation of the charges,

28

the range of possible punishments, or the court process, and he lacked the capacity to communicate with his lawyer.

97.    Defendant TENNEY concluded that STEPHEN met the requirements for a "Legal 2000" and a medical release.

98.    On February 21, 2019, Defendant GARNER reviewed STEPHEN's food log and noted that he still was not eating and continued to refuse the offered Gatorade.

99.    On February 27, 2019, Defendant MAPLETON observed STEPHEN's cell to have dried food on the floor. Defendant MAPLETON reviewed STEPHEN's food log and noted that he still was not eating.

100.    On February 27, 2019, seven days after Defendant TENNEY evaluated him, STEPHEN weighed 136.8 pounds, 37.2 pounds less than he weighed 46 days earlier.

101.    On March 1, 2019, more than a week after Defendant TENNEY evaluated STEPHEN and concluded that his physical health was in decline because of untreated mental illness, Defendant TENNEY submitted his order requesting a medical release.

102.    On no less than four occasions after Defendant TENNEY concluded that STEPHEN was undergoing non-volitional weight loss and that his mental and physical condition required a medical release, the MEDICAL DEFENDANTS failed to intervene and instead signed medical refusal forms on STEPHEN's behalf.

103.    On March 6, 2019, Defendants ELIASON, SCHROYER, and HOLMES became aware that STEPHEN was unable or refusing to leave his cell in order to attend court.

104.    That same day, STEPHEN told Defendant MAPLETON, "I'm sick. I threw up" and that he was feeling feverish.

105.    Defendant MAPLETON failed to take or record STEPHEN's weight.

106.    Defendant MAPLETON failed to intervene in any medically meaningful way.

//

107. Instead, Defendant MAPLETON merely noted his opinion that STEPHEN was not suffering from an "acute nutritional order, but risk is increasing" and that the MEDICAL DEFENDANTS should "consider" a "Legal 2000 designation this week."

108. On March 7, 2019, Defendant TENNEY again evaluated STEPHEN.

109. Defendant TENNEY observed that STEPHEN was "in decline" and "not eating."

110. Defendant TENNEY requested an immediate "Legal 2000," noting that STEPHEN's case was closed and that he was to be released that day.

111. That same day, STEPHEN was brought to the medical unit in a wheelchair and evaluated by Defendant PHILLIPS. Defendant PHILLIPS determined that STEPHEN could not be weighed because he was so weak that he could not stand and presented a fall risk.

112. Rather than release STEPHEN to the hospital or provide medically necessary mental and physical health care, Defendant PHILLIPS provided STEPHEN with a sandwich, apple, and milk and sent him back to his isolation cell.

113. On March 7, 2019, at approximately 5:00 p.m., Defendant MORGAN informed Defendant ELIZONDO that STEPHEN was due to be released to the hospital on a "Legal 2000."

114. That same day, at approximately 9:15 p.m., Defendant ELIZONDO spoke to Defendants SMITH and WEDIG regarding STEPHEN's release. Defendant SMITH informed Defendant ELIZONDO that he knew STEPHEN was not eating and was on a food log.

115. On March 8, 2019, at approximately 2:00 a.m., Defendant ELIZONDO contacted transport officers, on information and belief Defendants RAZ and MILLETT, seeking a release voucher.

116. Transport officers, on information and belief Defendants RAZ and MILLETT, informed Defendant ELIZONDO that STEPHEN was not being released to the hospital, but was being transferred to the Clark County Detention Center.

117.  Defendant ELIZONDO concluded that there was "no need for the [Legal 2000]."

118.  On March 8, 2019, at approximately 3:45 a.m., Defendant ELIZONDO was called to STEPHEN's unit for "a psych release." Defendant ELIZONDO informed Defendant PARKER that STEPHEN "would not be leaving on a [Legal 2000]."

119.  On March 8, 2019, at approximately 4:00 a.m., Defendants CHAPARRO-WILSON and WASHINGTON placed a food tray in STEPHEN's cell.

120.  At approximately 4:25 a.m., Defendants CHAPARRO-WILSON and WASHINGTON returned to STEPHEN's cell to discover that STEPHEN had not eaten.

121.  The officers asked STEPHEN if he was going to eat. However, STEPHEN did not respond, at which time Defendant CHAPARRO-WILSON grabbed STEPHEN's left arm—STEPHEN was unresponsive.

122.  Defendant CHAPARRO-WILSON radioed for Defendant THOMSON. Defendant PARKER was also radioed to respond to the unit.

123.  Upon Defendant PARKER's arrival, he and Defendant CHAPARRO-WILSON entered STEPHEN's cell but could not elicit a response from STEPHEN.

124.  At approximately 4:27 a.m., Defendant THOMSON responded to the unit to evaluate STEPHEN, but she could not obtain any vitals. She therefore requested that additional medical personnel respond to STEPHEN's unit.

125.  At approximately 4:33 a.m., Defendant PARKER requested an ambulance.

126.  At approximately 4:35 a.m., additional medical staff, including Defendants PHILLIPS, ELIZONDO, and PONGAN, responded to the unit with medical supplies to treat STEPHEN.

127.  At approximately 4:36 a.m., STEPHEN was placed on the floor so that CPR could be administered and an AED attached to STEPHEN's chest.

128.  At approximately 4:38 a.m., medical personnel gave STEPHEN his first AED shock in an attempt to resuscitate him.

129.   At approximately 4:40 a.m., Defendant PARKER contacted Lieutenant Landrove.

130.   At approximately 4:43 a.m., Las Vegas Fire Engine 8 arrived, entered the cell, and placed STEPHEN on a gurney.

131.   At approximately 4:47 a.m., AMR Unit 156 arrived and entered STEPHEN's unit.

132.   At approximately 4:52 a.m., Fire Engine 8 left the City Jail to transport STEPHEN to Sunrise Hospital, followed by Defendants RAZ and MILLETT.

133.   At approximately 5:12 a.m., STEPHEN was pronounced dead by the Sunrise Hospital medical staff.

134.   On March 9, 2019, an autopsy was conducted by the Clark County Coroner, which concluded that STEPHEN died from inanition.

135.   During STEPHEN's detention, from January 12, 2019 until his death on March 8, 2019, the MEDICAL DEFENDANTS signed no fewer than eight medical refusal forms on STEPHEN's behalf.

136.   On information and belief, during STEPHEN's detention, none of the INDIVIDUAL DEFENDANTS attempted to transfer STEPHEN from isolation to a medical or psychiatric unit.

137.   On information and belief, during STEPHEN's detention, none of the INDIVIDUAL DEFENDANTS attempted, or sought authorization, to force-feed STEPHEN.

//

//

//

1

**Wellpath and the City's ongoing and widespread custom, pattern, and practice of**

2

**providing constitutionally inadequate medical and mental health care.**

3

138.    WELLPATH is the nation's largest for-profit provider of medical and mental

4

health care to correctional facilities, including facilities located in 37 states.[1]

5

139.    WELLPATH has attained this position, in part, through a well-publicized

6

policy of "cost containment," whereby WELLPATH "work[s] to create efficiencies in

7

staffing, pharmacy, and off-site costs. . ." and markets those "efficiencies" to

8

municipalities seeking to reduce expenditures associated with operating their facilities.[2]

9

140.    As detailed in a CNN investigation published in June of 2019, five months

10

after STEPHEN's death, WELLPATH's policy of "cost-containment" has caused the

11

company's employees and agents to "den[y] urgent emergency room transfers [and] fail[]

12

to spot or treat serious psychiatric disorders . . ," leading to lawsuits arising from "more

13

than 70 deaths" over the previous five years.[3]

14

141.    Based on interviews with current and former WELLPATH employees, CNN

15

determined that the company "has repeatedly relied on inexperienced workers, offered

16

minimal training and understaffed facilities."[4]

17

142.    WELLPATH employees have complained that "specialized testing,

18

medication and treatments were often denied" and medical units were often understaffed,

19

leading to medical errors. [5]

20

21

22

_____

23

24

[1] Blake Ellis and Melanie Hicken, CNN Investigation, CNN (June 2019),

25

https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/; Correct Care Solutions
RFP 18-026, Lancaster County Youth Service Center.

26

[2] *See* Correct Care Solutions RFP 18-026, Lancaster County Youth Service Center.

27

[3] Blake Ellis and Melanie Hicken, CNN Investigation, CNN (June 2019),
https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.

28

[4] *Id.*

[5] *Id.*

143.    Indeed, some of the most egregious examples of inadequate medical care provided by WELLPATH, and documented by CNN, occurred at the Las Vegas Detention Center ("City Jail").

144.    In 2013, Angela Donatell entered the City Jail and was processed or screened by Defendant DORADO. Donatell had previously been held at the City Jail and during one of those detentions, she was transferred to the emergency room for medical problems related to diabetes.[6]

145.    Despite being aware of Donatell's diagnosis, WELLPATH and the CITY did not provide her with diabetes medication, appropriate nutrition, or treatment, but instead placed her in an administrative segregation cell, where she was "monitored" by defendant MAPLETON, among others.[7]

146.    On October 1, 2013, Donatell was found unresponsive in her cell and was later pronounced dead at Sunrise Hospital.[8]

147.    In the subsequent lawsuit, medical experts determined that: (1) WELLPATH and the CITY maintained inadequate levels of competent staff and equipment to assist patients; (2) WELLPATH and the CITY inadequately trained their employees and agents in the "recognition, treatment, and appropriate referral for hypo and hyperglycemia"; and (3) defendant MAPLETON, in particular, failed to provide medically necessary treatment to Donatell.[9]

148.    In 2014, Teaira Shorter entered the City Jail. Shorter soon began vomiting, experiencing frequent bowel movements, and requesting that she be taken to the hospital.[10]

---

[6] Complaint at ¶ 15, *Donatell v. City of Las Vegas*, Case 2:15-cv-023340RFB-PAL (Doc. 81).
[7] Expert affidavit, *Donatell v. City of Las Vegas*, Case 2:15-cv-023340RFB-PAL (Doc. 81-1).
[8] *Id.*
[9] *Id.*
[10] Complaint at ¶ 20-23, *Shorter v. City of Las Vegas*, Case 2:16-cv-00971-KJD-DJA (Doc. 1).

149. Over the course of a week and a half, Shorter repeatedly complained to CITY and WELLPATH employees and agents that she was experiencing significant abdominal pain, constant vomiting, and diarrhea. [11]

150. Despite her symptoms and requests to be hospitalized, WELLPATH and the CITY provided Shorter with little to no medical treatment and refused to transfer her to the hospital.[12]

151. During the period of her detention at the City Jail, Shorter lost 22 pounds.[13]

152. When she was finally transferred to UMC, over a week after she began complaining of symptoms, Shorter was diagnosed with appendicitis and an appendix that had burst five days earlier.[14]

153. According to a WELLPATH medical director at a jail in South Carolina, WELLPATH employees intentionally delay making emergency room transfer requests because the company pressures them to limit such transfers in order to reduce expenditures.[15]

154. In December of 2018, less than a month before STEPHEN entered the City Jail, the Department of Justice, Civil Rights Division, conducted an investigation into the state of medical and mental health care provided by WELLPATH at a jail in Virginia. The investigation concluded that WELLPATH and the jail "fail[ed] to provide constitutionally adequate medical and mental health care to prisoners, including by placing prisoners with serious mental illness in restrictive housing for prolonged periods. . .."[16]

---

[11] *See*, *e.g*, *Id.* at ¶ 34.
[12] *Id.* ¶ 34, 40.
[13] *Id.* at ¶ 36.
[14] *Id.* at ¶ 42.
[15] Blake Ellis and Melanie Hicken, CNN Investigation, CNN (June 2019), https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.
[16] United States Department of Justice, Civil Rights Division, Hampton Roads Investigation Notice (December 19, 2018) at p.1, https://www.documentcloud.org/documents/5978540-Hampton-Roads-DOJ-report.html.

155.   WELLPATH and the Virginia jail "fail[ed] to properly screen prisoners for mental illness; provide adequate treatment planning; adequately administer medications and psychotherapy; and properly treat and supervise suicidal prisoners."[17]

156.   The investigation determined that "the Jail places prisoners with mental health disabilities in restrictive housing on administrative status specifically because they are 'mentally deficient,' with no disciplinary or other reason given," and in so doing violates the ADA. [18]

157.   The DOJ determined that jail officials evinced deliberate indifference to prisoners' constitutional rights to adequate medical care, in part by renewing the jail's contract with WELLPATH after becoming aware that the company "fail[ed] to provide appropriate clinically necessary medical services . . . and offsite services and hospitalization. . .."[19]

158.   On October 1, 2018, WELLPATH's President, Kip Hallman, stated that "[o]ver the years, as the country's health care system has changed, we have seen more and more individuals with acute mental health diagnoses and substance use disorders being treated by our doctors, nurses and clinicians in correctional settings."[20]

159.   While recognizing that the number of individuals receiving mental health care in correctional facilities is increasing, WELLPATH and the CITY have chosen to prioritize the various permutations of "cost-containment" over patient care, with devastating effects for individuals in need of medical and mental health care at the City Jail.

---

[17] *Id.* at p. 5.
[18] *Id.* at p. 6.
[19] *Id.* at p. 21.
[20] "Correct Care Solutions and Correctional Medical Group Companies Join Forces to Deliver Best-in-Class Healthcare," H.I.G. Capital News (October 1, 2018), https://higcapital.com/news/release/correct-care-solutions-and-correctional-medical-group-companies-join-forces-to-deliver-best-in-class-healthcare.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FIRST CLAIM FOR RELIEF**

**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**

**IN VIOLATION OF FOURTEENTH AMENDMENT (42 U.S.C. § 1983)**

***Special Administrator v. Individual Defendants***

160.   Plaintiffs repeat and reallege every allegation contained in the above paragraphs with the same force and effect as if set forth herein, and further allege as follows:

161.   Individuals held in state custody have a constitutional right to adequate medical and mental health care.

162.   For pre-trial detainees, this right is secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

163.   The INDIVIDUAL DEFENDANTS made intentional decisions regarding the conditions under which STEPHEN was confined, including, but not limited to, where STEPHEN was housed, and whether and how STEPHEN was treated, monitored, transferred, and otherwise protected during his confinement.

164.   The conditions of STEPHEN's confinement put him at substantial risk of suffering serious harm.

165.   The INDIVIDUAL DEFENDANTS did not take reasonably available measures to abate that risk, though reasonable state actors in the same circumstances would have appreciated the high degree of risk.

166.   The consequences of the INDIVIDUAL DEFENDANTS' conduct was obvious and their conduct caused STEPHEN's death by starvation and Plaintiffs' injuries.

167.   The INDIVIDUAL DEFENDANTS' conduct amounted to reckless disregard for STEPHEN's health and safety and was therefore objectively unreasonable.

168.   The INDIVIDUAL DEFENDANTS were well-aware of STEPHEN's various diagnoses, their deleterious effect on his ability to engage in self-care, and his deteriorating mental and physical health.

169.   Despite this, the INDIVIDUAL DEFENDANTS failed to intervene over the course of 56 days with medically necessary mental and physical health care.

170.   Thus, the INDIVIDUAL DEFENDANTS were the direct and proximate cause of STEPHEN's injuries and damages, as well as those of his estate and heirs.

171.   Not only did the INDIVIDUAL DEFENDANTS cause STEPEHEN's injuries and damages, they callously exacerbated his pain and suffering.

172.   The INDIVIDUAL DEFENDANTS acted willfully, wantonly, knowingly, purposefully, and with reckless disregard and deliberate indifference, thereby depriving STEPHEN of his clearly established rights to adequate medical and mental health care.

173.   As a result of this unconstitutional conduct, the INDIVIDUAL DEFENDANTS are liable to Plaintiffs for compensatory and punitive damages, as well as attorney's fees.

## SECOND CLAIM FOR RELIEF
### DEPRIVATION OF FAMILIAL ASSOCIATION
### IN VIOLATION OF THE FOURTEENTH AMENDMENT (42 U.S.C. § 1983)
*** All Plaintiffs v. Individual Defendants***

174.   Plaintiffs repeat and reallege every allegation contained in the above paragraphs with the same force and effect as if set forth herein, and further allege as follows:

175.   Parents and children have constitutionally protected liberty interests in companionship and association, secured by the Due Process Clause of the Fourteenth Amendment.

176.   The Due Process Clause protects against unwarranted state interference in these relationships and associations.

177.   The INDIVIDUAL DEFENDANTS unlawfully, and without any legitimate state interest, interfered with these familial relationships when they denied STEPHEN medically necessary mental and physical health care, thereby causing his prolonged and

painful mental and physical deterioration, culminating in STEPHEN's death from starvation.

178.   The INDIVIDUAL DEFENDANTS' unlawful acts and omissions shock the conscience of a just and fair society.

179.   The INDIVIDUAL DEFENDANTS acted willfully, wantonly, knowingly, with purpose to harm, and with reckless disregard and deliberate indifference over a protracted period of 56 days, during which the INDIVIDUAL DEFENDANTS had countless opportunities to intervene and prevent STEPHEN's deterioration and death— opportunities which they failed to take.

180.   The INDIVIDUAL DEFENDANTS thereby deprived STEPHEN and Plaintiffs of their clearly established rights under the Fourteenth Amendment to the United States Constitution.

181.   The INDIVIDUAL DEFENDANTS were the direct and proximate cause of the injuries and damages suffered by each Plaintiff, including, but not limited to, the loss of society, companionship, assistance, protection, affection, moral support, financial support, and other services and benefits associated with these relationships.

182.   As a result of this unconstitutional conduct, the INDIVIDUAL DEFENDANTS are liable to Plaintiffs for compensatory and punitive damages, as well as attorney's fees.

## THIRD CLAIM FOR RELIEF
## OVER-DETENTION
## IN VIOLATION OF THE FOURTEENTH AMENDEMENT (42 U.S.C. § 1983)
### *Special Administrator v. Individual Defendants*

183.   Plaintiffs repeat and reallege every allegation contained in the above paragraphs with the same force and effect as if set forth herein, and further allege as follows:

184.  Pre-trial detainees held in state custody have a constitutional right to be free from continued detention after it is known or should be known that the detainee is entitled to release.

185.  Freedom from incarceration is the paradigmatic liberty interest protected by the Due Process Clause of the Fourteenth Amendment.

186.  The INDIVIDUAL DEFENDANTS unlawfully interfered with this interest when they halted, obstructed, or delayed STEPHEN's court-ordered release, thereby preventing STEPHEN from obtaining medically necessary mental and physical health care outside the City Jail.

187.  Thus, the INDIVIDUAL DEFENDANTS were the direct and proximate cause of STEPHEN's injuries and damages, as well as those of his estate and heirs.

188.  The INDIVIDUAL DEFENDANTS' unlawful acts and omissions shock the conscience of a just and fair society.

189.  The INDIVIDUAL DEFENDANTS acted willfully, wantonly, knowingly, purposefully, and with reckless disregard and deliberate indifference, thereby depriving STEPHEN of his clearly established rights under the Fourteenth Amendment to the United States Constitution.

190.  As a result of this unconstitutional conduct, the INDIVIDUAL DEFENDANTS are liable to Plaintiffs for compensatory and punitive damages, as well as attorney's fees.

## FOURTH CLAIM FOR RELIEF

### *MONELL* LIABILITY – FAILURE TO TRAIN (42 U.S.C. § 1983)

### *Special Administrator v. City of Las Vegas & Wellpath*

191.  Plaintiffs repeat and reallege every allegation contained in the above paragraphs with the same force and effect as if set forth herein, and further allege as follows:

192.    At all relevant times, the CITY and WELLPATH, through their officials and agents, maintained policies and customs of failing to adequately train, investigate, supervise, and discipline their agents and employees with respect to the proper treatment and care of mentally ill individuals within their custody and control.

193.    The CITY and WELLPATH, through their officials and agents, failed to adequately train, investigate, supervise, or discipline their employees in the following areas:

a. Effectively screening and processing mentally ill individuals entering the City Jail;

b. Properly and appropriately housing those individuals with known medical and mental health needs based on those needs, including, but not limited to, initial housing assignment, transfer to specialized units within the City Jail, and transfer to medical or psychiatric facilities outside the City Jail;

c. Adequately treating and medicating those individuals with known medical and mental health needs;

d. Adequately monitoring and protecting those individuals with known medical and mental health needs, especially those with a history of failing to engage in self-care;

e. Timely receiving and/or deferring to the court's and/or medical authorities' orders and recommendations for medical and mental health care;

f. Efficiently coordinating and implementing the court's and/or medical authorities' orders and recommendations for medical and mental health care, including, but not limited to, timely complying with the court's and/or medical authorities' orders and recommendations to transfer or release at-risk individuals;

g. Humanely force-feeding or otherwise providing nourishment to starving individuals to ensure that such individuals receive nourishment sufficient to sustain their health and their life;

h. Promptly contacting the appropriate medical professionals and/or emergency services in cases of medical and mental health emergencies and/or promptly and adequately intervening during the same.

194.    The CITY and WELLPATH's failure to adequately train, supervise, investigate, and discipline their agents and employees in the above-mentioned areas resulted in the INDIVIDUAL DEFENDANTS acting with unchecked authority and discretion and deliberate indifference to the rights of mentally ill individuals within their custody and control, including STEPHEN.

195.    The CITY and WELLPATH, through their agents and officials, were well-aware that their policies and customs of failing to adequately train, investigate, supervise, and discipline their agents and employees would result in the constitutional violations and injuries stated herein.

196.    Despite this, the CITY and WELLPATH, through their officials and agents, made conscious choices to maintain their policies and customs of failing to adequately train, investigate, supervise, and discipline their agents and employees in the above-mentioned areas, for reasons peculiar to each Defendant, including, but not limited to, the pursuit of profit and political expediency. These choices were made with deliberate indifference to the constitutional rights of mentally ill individuals within their custody and control.

197.    Thus, the CITY and WELLPATH, through their officials and agents, knew of and consciously disregarded a known and obvious consequence of their policies and customs, resulting in the constitutional violations and injuries stated herein.

198.    This inadequate training, investigation, supervision, and discipline was the direct and proximate cause of the constitutional violations and injuries suffered by STEPHEN, and the CITY and WELLPATH are liable to Plaintiffs for damages related to the same.

# FIFTH CLAIM FOR RELIEF
## *MONELL* LIABILITY – POLICY & CUSTOM (42 U.S.C. § 1983)
### *Special Administrator v. City of Las Vegas & Wellpath*

199.   Plaintiffs repeat and reallege every allegation contained in the above paragraphs with the same force and effect as if set forth herein, and further allege:

200.   At all times relevant times, the CITY and WELLPATH, through their officials and agents, maintained constitutionally inadequate  policies, customs, and procedures with respect to the proper treatment and care of mentally ill individuals within their custody and control, including:

a. Ineffectively screening and processing mentally ill individuals entering the City Jail;

b.  Improperly and inappropriately housing those individuals with known medical and mental health needs, including, but not limited to, initial housing assignment, transfer to specialized units within the City Jail, and transfer to medical or psychiatric facilities outside the City Jail;

c. Inadequately treating and medicating those individuals with known medical and mental health needs;

d. Inadequately monitoring and protecting those individuals with known medical and mental health needs, especially those with a history of failing to engage in self-care;

e. Failing to timely receive and/or defer to the court's and medical authorities' orders and recommendations for medical and mental health care;

f. Failing to efficiently coordinate and implement the court's and/or medical authorities' orders and recommendations for medical and mental health care, including, but not limited to, timely complying with the court's and/or medical authorities' orders and recommendations to transfer or release at-risk individuals;

g. Failing to humanely force-feed or otherwise provide nourishment to starving individuals to ensure that such individuals receive nourishment sufficient to sustain their health and their life;

h. Failing to promptly contact the appropriate medical professionals and/or emergency services in cases of medical and mental health emergencies and/or adequately intervening during the same;

i. Maintaining inadequate staffing levels to address the basic medical and mental health care needs of mentally ill individuals within their custody and control.

201.    The CITY and WELLPATH's constitutionally inadequate policies, customs, and procedures caused the INDIVIDUAL DEFENDANTS to act with deliberate indifference to the rights of mentally ill individuals within their custody and control, including STEPHEN.

202.    The CITY and WELLPATH, through their agents and officials, were well-aware that their constitutionally inadequate policies, customs, and procedures would result in the constitutional violations and injuries stated herein.

203.    Despite this, the CITY and WELLPATH, through their officials and agents, made conscious choices to maintain their constitutionally inadequate policies and customs related to the treatment of mentally ill individuals for reasons peculiar to each Defendant, including, but not limited to, the pursuit of profit and political expediency. These choices were made with deliberate indifference to the constitutional rights of mentally ill individuals within their custody and control.

204.    Thus, the CITY and WELLPATH, through their officials and agents, knew of and consciously disregarded a known and obvious consequence of their policies and customs, resulting in the constitutional violations and injuries stated herein.

205.    These constitutionally inadequate policies, customs, and procedures were the direct and proximate cause of the constitutional violations and injuries suffered by STEPHEN, and the CITY and WELLPATH are liable to Plaintiffs for damages related to the same.

**SIXTH CLAIM FOR RELIEF**

**DISABILITY DISCRIMINATION**

**IN VIOLATION OF THE REHABILITATION ACT OF 1973 and TITLE II**

**OF THE AMERICANS WITH DISABILITIES ACT ("ADA")**

***Special Administrator v. City of Las Vegas & Wellpath***

206.   Plaintiffs repeat and reallege every allegation contained in the above paragraphs with the same force and effect as if set forth herein, and further allege:

207.   At all relevant times, STEPHEN was protected under the ADA and Rehabilitation Act because he suffered from and/or was diagnosed with mental impairments and disorders, including schizophrenia, bipolar disorder, major-depressive disorder, polysubstance-dependence disorder, and psychosis.

208.   These mental impairments substantially limited STEPHEN's major life activities, including, but not limited to, his ability to communicate with others, cope with the stress of confinement and isolation, and engage in basic, life sustaining self-care.

209.   The City Jail receives federal funding to provide reasonable accommodations to disabled individuals.

210.   The CITY and WELLPATH, through their officials and agents, were aware of STEPHEN's various diagnoses and their deleterious effect on his ability to engage in self-care, because such diagnoses and their effects were documented during STEPHEN's prior confinements at the City Jail.

211.   Additionally, agents and employees of the CITY and WELLPATH, including many of the INDIVIDUAL DEFENDANTS, had previously evaluated and interacted with STEPHEN and treated STEPHEN's mental impairments and disorders during his prior confinements.

212.   Despite this, the CITY and WELLPATH did not modify their policies, customs, and procedures to accommodate and avoid discriminating against STEPHEN based on his protected disabilities.

213. The CITY and WELLPATH, through their officials and agents, intentionally and with deliberate indifference, failed to provide STEPHEN with medically necessary mental and physical health care, including effective screening, necessary and previously prescribed medications and nourishment, as well as medically necessary referrals, transfers, and emergency interventions, knowing full-well that their acts and omissions violated STEPHEN's constitutional and statutory rights.

214. The CITY and WELLPATH, through their officials and agents, intentionally and with deliberate indifference, housed STEPHEN in an isolation cell, as opposed to a medical or psychiatric unit, where he could not be properly treated, monitored, or otherwise protected, knowing full-well that their acts and omissions violated STEPHEN's constitutional and statutory rights.

215. The CITY and WELLPATH, through their officials and agents, had ample time and opportunity to accommodate STEPHEN's disabilities by providing medically necessary mental and physical health care and housing STEPHEN in an appropriate unit, by seeking authorization to force-feed STEPHEN, and by properly training, supervising, and disciplining their agents and employees to screen and care for individuals suffering from mental impairments and disorders.

216. The CITY and WELLPATH could have accommodated STEPHEN's disabilities at little to no additional expense or risk.

217. By failing to accommodate STEPHEN's disabilities and discriminating against STEPHEN based on the same, the CITY and WELLPATH, through their agents and employees, were the direct and proximate cause of the constitutional and statutory violations and injuries suffered by STEPHEN, and the CITY and WELLPATH are liable to Plaintiffs for damages related to the same.

//

//

## SEVENTH CLAIM FOR RELIEF

### WRONGFUL DEATH

### IN VIOLATION OF NEVADA STATE LAW

*SMB, SFB, and Mariam Blue v. All Defendants*

218.   Plaintiffs repeat and reallege every allegation contained in the above paragraphs with the same force and effect as if set forth herein, and further allege:

219.   The Defendants acted recklessly and negligently by:

a. Failing to provide STEPHEN with medically necessary mental and physical health care, including effective screening, necessary and previously prescribed medications and nourishment, as well as medically necessary referrals, transfers, and emergency interventions;

b. Housing STEPHEN in an isolation cell, as opposed to a medical or psychiatric unit, where he could not be properly treated, monitored, or otherwise protected;

c. Failing to seek authorization to force-feed STEPHEN;

d. Failing to properly train, supervise, and discipline their agents and employees to screen and care for individuals suffering from mental impairments and disorders.

220. Defendants CITY and WELLPATH are vicariously liable for the INDIVIDUAL DEFENDANTS' reckless and negligent conduct because the INDIVIDUAL DEFENDANTS were state actors whose acts were committed under color of state law and within the scope of their duties and authorities as officers for the CITY.

221.   The Defendants' reckless and negligent conduct was the direct and proximate cause of the injuries suffered by STEPHEN and Plaintiffs.

222.   These injuries include:

a. STEPHEN's severe mental anguish and physical pain over 56 days;

b. STEPHEN's suffering and death;

c. Plaintiffs' grief, sorrow, loss of support, companionship, society, comfort, consortium, and mental and physical pain and suffering;

d. Funeral expenses.

223.   SMB, SFB, and BLUE each seek all permissible damages under Nev. Rev. Stat. § 41.085, including, but not limited to, compensatory damages for STEPHEN's severe mental anguish and physical pain, STEPHEN's suffering and death, and Plaintiffs' individual grief, sorrow, loss of support, companionship, society, comfort, consortium, and mental and physical pain and suffering.

224.   SMB, SFB, and BLUE also seek statutory attorney's fees and costs.

## EIGHTH CLAIM FOR RELIEF
### WRONGFUL DEATH
### IN VIOLATION OF NEVADA STATE LAW
### *Special Administrator v. All Defendants*

225.   Plaintiffs repeat and reallege every allegation contained in the above paragraphs with the same force and effect as if set forth herein, and further allege:

226.   The Defendants acted recklessly and negligently by:

a. Failing to provide STEPHEN with medically necessary mental and physical health care, including effective screening, necessary and previously prescribed medications and nourishment, as well as medically necessary referrals, transfers, and emergency interventions;

b. Housing STEPHEN in an isolation cell, as opposed to a medical or psychiatric unit, where he could not be properly treated, monitored, or otherwise protected;

c. Failing to seek authorization to force-feed STEPHEN;

d. Failing to properly train, supervise, and discipline their agents and employees to screen and care for individuals suffering from mental impairments and disorders.

227.   The Defendants' reckless and negligent conduct was the direct and proximate cause of the injuries suffered by STEPHEN and Plaintiffs.

228.   These injuries include:

a. STEPHEN's severe mental anguish and physical pain over 56 days;

b. STEPHEN's death;

c. Plaintiffs' grief, sorrow, loss of support, companionship, society, comfort, consortium, and mental and physical pain and suffering;

d. Funeral expenses.

229.   Defendants CITY and WELLPATH are vicariously liable for the INDIVIDUAL DEFENDANTS' reckless and negligent conduct because the INDIVIDUAL DEFENDANTS were state actors whose acts were committed under color of state law and within the scope of their duties and authorities as officers for the CITY.

230.   BLUE, as the Special Administrator of STEPHEN's estate, seeks all permissible damages under Nev. Rev. Stat. § 41.100, including, but not limited to, funeral expenses and all permissible penalties, including exemplary and punitive damages.

231.   BLUE, as the Special Administrator of STEPHEN's estate, also seeks statutory attorney's fees and costs.

## NINTH CLAIM FOR RELIEF
### NEGLECT OF A VULNERABLE PERSON
### IN VIOLATION OF NEVADA STATE LAW
### *Special Administrator v. All Defendants*

232.   Plaintiffs repeat and reallege every allegation contained in the above paragraphs with the same force and effect as if set forth herein, and further allege:

233.   At all relevant times, STEPHEN suffered from and/or was diagnosed with mental impairments and disorders, including schizophrenia, bipolar disorder, major-depressive disorder, polysubstance-dependence disorder, and psychosis, which substantially limited STEPHEN's major life activities, including, but not limited to, his ability to communicate with others, cope with the stress of confinement and isolation, and engage in basic, life sustaining self-care

234.   At all relevant times, STEPHEN had a medical or psychological record of his mental impairments and disorders and was regarded as having such impairments and disorders.

235.    At all relevant times,  the Defendants knew that STEPHEN was a vulnerable person withing the meaning of Nev. Rev. Stat. § 41.1395(4)(e).

236.    The Defendants had legal duties to provide STEPHEN, a pre-trial detainee housed at the City Jail, with medically necessary mental and physical health care.

237.    The Defendants breached their duties by failing to provide STEPHEN with medically necessary care, thereby directly and proximately causing STEPHEN's pain, suffering, and death.

238.    The Defendants' breach of their duties constitutes abuse and neglect under Nev. Rev. Stat. §§ 41.1395(4)(a), (c).

239.    Defendants CITY and WELLPATH are vicariously liable for the INDIVIDUAL DEFENDANTS' reckless and negligent conduct because the INDIVIDUAL DEFENDANTS were state actors whose acts were committed under color of state law and within the scope of their duties and authorities as officers for the CITY.

240.    BLUE, as the Special Administrator of STEPHEN's estate, seeks all permissible damages under Nev. Rev. Stat. §§ 41.1395, 41.085, and 41.100.

241.    BLUE, as the Special Administrator of STEPHEN's estate, also seeks statutory attorney's fees and costs.

## TENTH CLAIM FOR RELIEF
## MEDICAL MALPRACTICE
## IN VIOLATION OF NEVADA STATE LAW
### *All Plaintiffs v. Medical Defendants*

242.    Plaintiffs repeat and reallege every allegation contained in the above paragraphs with the same force and effect as if set forth herein, and further allege:

243.    The MEDICAL DEFENDANTS had legal duties to exercise due care in providing medical care to STEPHEN.

244.    The MEDICAL DEFENDANTS had heightened duties to use the skill, prudence, and diligence commonly used by other members of the medical profession.

245. The MEDICAL DEFENDANTS breached their duties of care to STEPHEN by failing to provide STEPHEN with medically necessary care.

246. As attested to by Dr. Daniel O. Laird, M.D.'s declaration, attached as Exhibit "C", that breach was the direct and proximate cause of STEPHEN's pain, suffering, and death.

247. The injuries sustained by STEPHEN occurred less than three years ago and were only discovered in May of 2020.

248. Plaintiffs seek all permissible damages under Nev. Rev. Stat. §§ 41.085 and 41.100.

249. Plaintiffs also seek statutory attorney's fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff BLUE individually, as STEPHEN's surviving mother, and as the Special Administrator of STEPHEN's estate, and Plaintiffs SMB and SFB, by their legal guardian LISA L. CARROLL, request entry of judgement in their favor and against All Defendants to this action, as follows:

a. For compensatory damages, including general and special damages, survival damages, and wrongful death damages under federal and state law, in an amount to be proven at trial;

b. For hedonic damages;

c. For funeral and burial expenses.

d. For medical expenses;

e. For punitive damages against INDIVIDUAL DEFENDANTS in an amount to be proven at trial;

f. For interest;

g. For the reasonable costs of this action, Court costs, and attorneys' fees; and

h. For such other and further relief as the Court may deem just, proper, and appropriate.

1    Dated this 28TH day of October 2021.

2

3                               PETER GOLDSTEIN LAW CORP

4

5                               /s/ Peter Goldstein
                                PETER GOLDSTEIN
6                               Attorneys for Plaintiffs
7                               *MARIAM BLUE, inidividually and as Special*
                                *Administrator of the Estate of STEPHEN*
8                               *BURRELL; LISA L. CARROLL on behalf of her*
9                               *wards SMB, and SFB, individually*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2

3       Plaintiffs hereby demand a trial by jury.

4

5       Dated this 28th day of October 2021.

6

7                                    PETER GOLDSTEIN LAW CORP

8

9                                    /s/ Peter Goldstein
                                     PETER GOLDSTEIN
10                                   Attorneys for Plaintiffs
11                                   *MARIAM BLUE, inidividually and as Special*
                                     *Administrator of the Estate of STEPHEN*
12                                   *BURRELL; LISA L. CARROLL on behalf of her*
13                                   *wards SMB, and SFB, individually*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>**CERTIFICATE OF SERVICE**</u>

2

I am employed in the County of Clark, State of Nevada.  I am over the age of eighteen years

3

and not a party to the within action; my business address is 10161 Park Run Drive, Suite 150, Las

4

Vegas, Nevada 89145.

5

I hereby certify that on this 28th day of October, 2021, a true and correct copy of the

6

following document **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY**

7

**TRIAL**  was  served  by electronically filing with the Court's CM/ECF electronic filing system to the

8

following parties:

9

Katherine Gordon, Esq.
Natalie J. Hagen, Esq.

10

LEWIS BRISBOIS BISGAARD & SMITH LLP
6385 South Rainbow Boulevard, Suite 600

11

Las Vegas, Nevada 89118
Tel: (702) 893-3383; Fax: (702) 893-3789

12

Email: Katherine.Gordon@lewisbrisbois.com
        Natalie.Hagen@lewisbrisbois.com

13

*Attorneys for Defendants*
*Wellpath, LLC f/k/a Correct Care Solutions,*

14

*LLC erroneously sued as Wellpath Care fka*
*Correct Care Solutions, Ebony-Michelle Garner,*

15

*Shawn Mapleton, M.D., Regina Elizondo,*
*Frances Boddie-Small, Virgilio Padilla and*

16

*Vicky Morgan*

Bryan K. Scott, Esq.
City Attorney
John A. Curtas, Esq.
Deputy City Attorney
495 South Main Street, 6th Floor
Las Vegas, Nevada 89101
Tel:  (702) 229-6629; Fax: (702) 386-1749
Email: jacurtas@lasvegasnevada.gov
*Attorneys for Defendants*
*City of Las Vegas, Michele Freeman, Robert*
*Straube, Lieutenant Sharon Meads, Lieutenant*
*Cesar Landrove, Lieutenant Venus Thompson,*
*Lieutenant Danielle Davis, Officer Richard*
*Dorado, Officer D'Angelo Chaparro-Wilson,*
*Officer Maurice Washington, Sgt. Marcos*
*Parker, Sgt. Charles Smith and Sgt. John Wedig*

17

18

Paul A. Cardinale SBN 8394
LAURIA TOKUNAGA GATES & LINN, LLP

19

1755 Creekside Oaks Drive, Suite 240
Sacramento, CA 95833

20

**Southern Nevada Office:**
601 South Seventh Street

21

Las Vegas, NV 89101
Tel: (702) 387-8633; Fax: (702) 387-8635

22

Email:  pcardinale@ltglaw.net
Liesa Costa at lcosta@ltglaw.net

23

*Attorney for Defendant MICHAEL POPOV, D.O.*

24

25

I declare that I am employed in the office of a member of the bar of this Court at whose

26

direction the service was made.

27

By: *Kris Bechtold*

An Employee of Peter Goldstein Law Corp

28

1

EXHIBIT A

EXHIBIT B

Electronically Filed
02/28/2021 9:29 AM

CLERK OF THE COURT

**OASA**
JULIE RAYE, ESQ.
Nevada Bar No. 10967
**THE GRACE LAW FIRM**
8530 W. Charleston Blvd., Ste. 100
Las Vegas, Nevada 89117
T: (702) 478-7600
F: (702) 366-1653
efilings@TheGraceLawFirm.com
*Attorney for Pettitioner*

### EIGHTH JUDICIAL DISTRICT COURT
### CLARK COUNTY, NEVADA

| In the Matter of the Estate of: <br><br> Stephen Burrell <br><br> Deceased. | Case No.: P-21-106061-E <br> Dept. No. 8 |
|---|---|

### ORDER APPOINTING SPECIAL ADMINISTRATOR AND FOR ISSUANCE OF SPECIAL LETTERS OF ADMINISTRATION

Upon submission of a verified ex parte petition for appointment of a special administrator and for issuance of special letters of administration representing as follows:

Stephen Burrell ("Decedent") died intestate on March 8, 2019 in Clark County, Nevada.

1. Decedent was a resident of Clark County, Nevada when he died.

2. Petitioner has never been convicted of a felony.

**NOW THEREFORE IT IS HEREBY ORDERED** that Petitioner Marian Blue is appointed as Special Administrator of the Estate of Roy Stephen Burrell and that Special Letters of Administration be issued, without bond, to Petitioner Marian Blue upon taking the oath of office, for the purpose of administering the estate in accordance with Nevada Revised Statutes Chapter §140.040.

**IT IS FURTHER ORDERED** that all moneys received by this Estate will be placed in the attorney's trust account until further ordered by the Court.

**IT IS FURTHER ORDERED** that the settlement of the Decedent's lawsuit is subject to this Court's approval.

Dated this _____ day of February 2021.

Dated this 28th day of February, 2021

_____
**DISTRICT COURT JUDGE**

7B8 876 80B0 0AC8
Jessica K. Peterson
District Court Judge

Submitted by:
**THE GRACE LAW FIRM**
*/s/ Julie Raye, Esq.*
**JULIE RAYE, ESQ.**
Nevada Bar No. 10967
8530 W. Charleston Blvd., Ste. 100
Las Vegas, Nevada 89117
*Attorney for Petitioner*

EXHIBIT C

## SWORN AFFIDAVIT OF DAN LAIRD, M.D.

STATE OF NEVADA  )
         )
COUNTY OF CLARK  )

COMES NOW, DAN LAIRD, who after being duly sworn, deposes and says:

1.  I am a licensed as a medical doctor in the States of Nevada, Idaho, and Colorado.  I hold an inactive medical license in the State of Washington.

2.   I have approximately 25 years of experience as an anesthesiologist, primary care physician, addiction medicine physician, and pain management physician.

3.  I hold a Bachelor of Science Degree in Zoology *summa cum laude* from the University of Idaho.

4.  I hold a Doctor of Medicine degree from the University of Washington School of Medicine in Seattle.

5.  I hold a Juris Doctor degree from the UNLV Boyd School of Law in Las Vegas and am actively licensed as an attorney in the State of Nevada.

6.  I practice or have practiced in areas that are the same or similar to the malpractice issues that are at question in this case.  My current medical practice focuses on primary care, pain management, and addiction medicine. Specifically, I have provided care to incarcerated patients, patients with severe psychiatric illness including schizophrenia, and have cared for patients with malnutrition.  I have also cared for patients who were a threat to themselves and have participated in the L2K process for patients in Nevada.

 **A.  I am a board-certified anesthesiologist, however, I am also trained in primary care.  Since 2014, I have practiced primarily primary care medicine, urgent care medicine, pain management, and addiction medicine.  Psychiatric illness is extremely prevalent among chronic pain patients. I have managed and currently manage hundreds of patients with manic depression, anxiety disorders, psychotic disorders including schizophrenia, ADHD, and other psychiatric illnesses.**

**B. I am familiar with the standards of care for providers of healthcare, as defined by NRS 41A.017, caring for patients with cachexia, malnutrition, dehydration, and inanition.**

7.   My experience and education are documented in my curriculum vitae (Attached hereto as Exhibit 1.)

8. I am board-certified by the National Board of Medical Examiners.

9. I am board-certified by the American Board of Medical Specialties.

10. I have been retained to review and comment on the standard of care of the providers of health care involved in the care of Stephen Burrell in February and March 2019.

11.    I have reviewed the available medical records of Stephen Burrell, including those from the episode(s) of care that are the subject of this lawsuit.  I offer all of my opinions to a reasonable degree of medical and professional probability.  These opinions support the allegations in the pending complaint.

12.    The patient, Stephen Burrell, was a 26-year-old African American man who died on or around March 8, 2019, after having been incarcerated at the City of Las Vegas Detention Center and cared for by Correct Care Solutions.

13.    Pursuant to the medical records, the cause of Mr. Burrell's death was "inanition."[1]  However, the Death Certificate that is available does not designate whether his death was due to homicide, suicide, accident, or undetermined.  The manner of death is listed by the Clark County Coroner as "natural."   The reason for the inanition is not clear from the Coroner's documents, including the Coroner's Investigative Report and other medical records that I have reviewed, other than the FOIA documents obtained by Mr. Burrell's family on or around May 7, 2020.

14.    On or around May 7, 2020, in response to a Freedom of Information Act Request (FOIA), it appears that the City of Las Vegas produced redacted public records related to the incarceration of Stephen Burrell.  I have reviewed these records as well, including medical and nursing notes from Correct Care Solutions.

15.    Though redacted, the records produced by the City of Las Vegas on or around May 7, 2020, demonstrate that Mr. Burrell had significant psychiatric illness that predated his death and should have been obvious to the providers of health care

---

[1] Taber's Medical Dictionary, 22nd Edition, defines "inanition" as a debilitated condition caused by lack of sufficient food material essential to the body, such as in starvation or malabsorption syndrome.  The condition may also be due to causes other than the food supply, such as malabsorption, or to other diseases of the gastrointestinal system that prevent absorption of food.

providing services to Mr. Burrell in the Las Vegas Detention Center. While the Coroner's documents state that Mr. Burrell had been diagnosed with schizophrenia, it was not clear that the psychiatric illness and substandard care was the cause of Mr. Burrell's inanition, to a reasonable degree of medical probability, until the FOIA records were produced in May 2020.

16.     Pursuant to the medical records, Mr. Burrell had been incarcerated at the Las Vegas Detention Center for trespass and jay walking on or around January 12, 2019. The FOIA records demonstrate that Mr. Burrell had very serious psychiatric illness, most likely psychotic delusions, that resulted in his refusing to ingest fluids or food for up to a month prior to his death. While there is discussion in the FOIA records of an L2K mental health hold on March 7, 2019, the day prior to his death, the L2K was not completed.

17.     Pursuant to the medical records obtained through the FOIA Request on May 7, 2020, it appears that the health care providers caring for Mr. Burrell between February 15, 2019, and March 8, 2019, took no meaningful intervention to save Mr. Burrell's life from inanition.

18.     Pursuant to the medical records, Mr. Burrell was found unconscious and unresponsive in his cell on March 8, 2019, at approximately 0425 AM. A psychologist with Las Vegas Detention Center/ Correct Care Solutions wrote in his medical record on March 7, 2019,

> Pt in decline. Food log not eating. Seems to operate at a concrete, poorly developed level. Cognitive challenge. Not communicative with any provider. Pt a concern for medical acuity. Request an immediate L2K.

For reasons that are not clear from the medical records, the L2K hold was not accomplished.

19.     More likely than not, and to a reasonable degree of medical probability, health care personnel with the Las Vegas Detention Center and Correct Care Solutions, fell below the standard of care by failing to treat Mr. Burrell's psychiatric illness in a manner that met the standard of care.

20.     More likely than not, and to a reasonable degree of medical probability, health care providers with the Las Vegas Detention Center and Correct Care Solutions, fell below the standard of care by failing to place Mr. Burrell on a Legal 2000 ("L2K") hold in med to late February 2019. A general rule of thumb in medicine and nursing is that a patient can survive 3 minutes without oxygen, 3 days without water, and 3 weeks without food. Here, a Registered Nurse with Correct Care Solutions wrote in Mr. Burrell's medical record on March 7, 2019,

> Received Report from Psych RN Dee, that patient was up for
> release 3/7/2019, and due to him not eating/ drinking fluids
> for several weeks, patient was to be placed on L2K and sent
> to the hospital for continuity of care.

21.    On a Correct Care Solutions Emergency Room/ Direct Admit Referral Request
form a social worker made the following entry in Stephen Burrell's medical record on
March 8, 2019,

> Unresponsive- no food x 1 month, unable to obtain VS [vital
> signs] / CPR [Cardiopulmonary Resuscitation] started,
> shocked X 1.

22.  There are multiple references in the medical records indicating that due to severe
psychiatric illness, Mr. Burrell had not ingested adequate amounts of fluid or food for
several weeks or a month prior to his death.  During this time, no provider of health care
with Las Vegas Detention Center or Correct Care Solutions intervened in any
meaningful way to ensure that Mr. Burrell received adequate hydration and nutrition.
This demonstrates an intentional disregard or deliberate indifference to Mr. Burrell's
wellbeing.

> **A. Due to the manner in which the medical and nursing records were kept, due
> to illegible writing, and due to redacted entries, for most of the providers of
> health care it is not possible to identify by name, the health care providers
> who were negligent and grossly negligent, however, these providers of health
> care were and are identified by their conduct.  NONE of the providers of
> health care, as defined by NRS 41A.017, met the standard of care with regard
> to ensuring that Mr. Burrell received adequate hydration and nutrition.**

> **B. A medical degree is not necessary to understand that human beings require
> food and water to survive.  The egregiousness of the providers of health care
> in this action cannot be overstated; it is difficult to imagine that ALL of these
> providers failed to intercede while a fellow human being starved to death and
> dehydrated to death while incarcerated in a modern correctional facility.**

> **C. ALL of the providers of health care who cared for Mr. Burrell during his
> incarceration at the Las Vegas City Jail were negligent and grossly negligent
> in their conduct toward Mr. Burrell.  Specifically, ALL of the providers of
> health care who cared for Mr. Burrell failed to ensure that he received
> adequate hydration. ALL of the providers of health care who cared for Mr.
> Burrell during his incarceration fell below the standard of care and were**

**grossly and egregiously negligent by failing to ensure that Mr. Burrell received adequate nutrition and hydration during his incarceration.**

**D. As noted in Paragraph 11 above, this Affidavit is intended to support all of the allegations in the pending Complaint as to providers or healthcare as defined by NRS 41A.017.**

23.     All of the medical and professional opinions expressed in this affidavit are to a reasonable degree of medical and professional probability and are based on the medical records available now; I reserve the right to change, modify, or revise my opinions if other records or additional information becomes available.

24.  The medical and professional opinions expressed herein are unique to the specific factual circumstances of this particular case and therefore may not apply to other cases or factual scenarios.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct

Executed on this 9th day of August 2021.

*/s/ Dan Laird*
Dan Laird, MD

| | |
|---|---|
| **From:** | Dan Laird |
| **Sent:** | Monday, August 16, 2021 7:40 PM |
| **To:** | Info |
| **Cc:** | Julie Raye |
| **Subject:** | Re: Merit |

---

Warning! This message was sent from outside your organization and we are unable to verify the sender.    Allow sender | Block sender

Thanks Matthew. You can affix my electronic signature. Dan

Get Outlook for iOS

---

**From:** Info <info@thegracelawfirm.com>
**Sent:** Monday, August 16, 2021 7:14:55 PM
**To:** Dan Laird <dan@lairdlaw.com>
**Cc:** Julie Raye <julie@thegracelawfirm.com>
**Subject:** Re: Merit

Matthew with the grace law firm. You sent me over the proposed revised version of the declaration of merit for Stephen Burrell last Saturday

Get Outlook for iOS

---

**From:** Dan Laird <dan@lairdlaw.com>
**Sent:** Monday, August 16, 2021 6:09:46 PM
**To:** Info <info@thegracelawfirm.com>
**Cc:** Julie Raye <julie@thegracelawfirm.com>
**Subject:** Re: Merit

Sorry, it's so awkward getting emails from people who don't identify themselves. Can you tell me who this is? Thanks, Dan Laird

Get Outlook for iOS

---

**From:** Info <info@thegracelawfirm.com>
**Sent:** Monday, August 16, 2021 6:17:02 PM
**To:** Dan Laird <dan@lairdlaw.com>
**Cc:** Julie Raye <julie@thegracelawfirm.com>
**Subject:** Re: Merit

I wanted to follow up on the status of the signed revised affidavit?

Get Outlook for iOS

---

**From:** Info
**Sent:** Tuesday, August 10, 2021 11:47:53 AM
**To:** Dan Laird <dan@lairdlaw.com>
**Cc:** Julie Raye <julie@thegracelawfirm.com>
**Subject:** RE: Merit

Good morning Dr. Laird

I do apologize for not responding to your email sooner. Yes, the revised Declaration is great. Please get it notarized and sent back over to me as soon as you can.

Again, thank you for everything. I will be referring a potential med mal case to you here shortly, just fyi.

The Team at

*Grace*Law

Tel: (702) 478-7600   Fax: (702) 366-1653
8530 W Charleston Blvd.
#100
Las Vegas, Nevada 89117
https://thegracelawfirm.com/

**\*\*PRIVILEGED AND CONFIDENTIAL\*\***
The information in this electronic mail is intended for the named recipients only. It may contain privileged and confidential matters. If you receive this email in error, please notify the sender immediately by replying to this email or by contacting the sender at (702) 478-7600. Please do not disclose the contents to anyone and delete this email message and any attachments from your workstation or network system mail system immediately. Thank you.

**From:** Dan Laird <dan@lairdlaw.com>
**Sent:** Saturday, August 7, 2021 12:20 PM
**To:** Info <info@thegracelawfirm.com>
**Subject:** RE: Merit

Hello,
Here are the proposed changes. Let me know if you need to discuss further.
I will get it notarized on Monday.
Thanks
Dan Laird

**From:** Info <info@thegracelawfirm.com>
**Sent:** Friday, August 6, 2021 4:09 PM
**To:** Dan Laird <dan@lairdlaw.com>
**Subject:** Merit

The Team at

*Grace*Law

Tel: (702) 478-7600   Fax: (702) 366-1653
8530 W Charleston Blvd.
#100
Las Vegas, Nevada 89117
https://thegracelawfirm.com/

**\*\*PRIVILEGED AND CONFIDENTIAL\*\***
The information in this electronic mail is intended for the named recipients only.
It may contain privileged and confidential matters. If you receive this email in
error, please notify the sender immediately by replying to this email or by
contacting the sender at (702) 478-7600. Please do not disclose the contents to
anyone and delete this email message and any attachments from your
workstation or network system mail system immediately. Thank you.